**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L. Yeates (*pro hac vice* forthcoming)
myeates@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph (*pro hac vice* forthcoming)
gjoseph@jhany.com
Mara Leventhal (*pro hac vice* forthcoming)
mleventhal@jhany.com
Christopher J. Stanley (*pro hac vice* forthcoming)
cstanley@jhany.com
Benjamin A. Taylor (*pro hac vice* forthcoming)
btaylor@jhany.com
800 Third Avenue, 30th Floor
New York, NY 10022
Tel: (212) 407-1210
Fax: (212) 407-1280

*Counsel for Plaintiffs and the proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RYAN CORDERO, PATRICK B. GOODWIN, HENRY HOBSON III, and CHRISTOPHER JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE, INC.,<br><br>Defendant. | Case No. 3:25-cv-4024<br><br>**COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, AND FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500, AND NEW YORK GENERAL BUSINESS LAW**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ryan Cordero, Patrick B. Goodwin, Henry Hobson III, and Christopher Johnson ("**Plaintiffs**"), by and through their undersigned attorneys, allege on personal knowledge as to themselves and their own conduct and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This class action seeks to recover from Coinbase, Inc. ("**Coinbase**") hidden fees that it has deceptively charged consumers for cryptocurrency trades in violation of California and New York's consumer protection statutes.

2.      Coinbase operates a trading platform where consumers can buy, sell, or exchange cryptocurrencies, such as Bitcoin or Ethereum. Coinbase presents consumers using its default trading option with an order preview (the "**Order Preview**") before placing an order. The image below is an example Order Preview from May 2024:[1]



3.      A reasonable consumer presented with this Order Preview would expect that Coinbase charges only $3.74 in fees in connection with the previewed transaction because the Order Preview explicitly states that the "Coinbase fee" is $3.74. But that would be wrong. In truth, Coinbase does

---

[1] The images of different order screens and previews from Coinbase's default platform at ¶¶ 2, 18, 20, 22, 23, 33, 35, and 40 of this Complaint were captured within a five-minute period on May 23, 2024.

not charge only $3.74 in fees for this particular transaction—it charges the consumer roughly $4.70 in fees.

4.    Instead of clearly disclosing to consumers the actual amount that Coinbase charges for cryptocurrency transactions, the company hides a portion of its fees in the "price" it quotes. The "price" Coinbase quotes consumers in a simple buy transaction on its Order Preview (like the one above) is 1% *higher* than the market price of the cryptocurrency that Coinbase shows elsewhere on its website and mobile application. That undisclosed 1% difference between the "price" quoted and the market price goes directly to Coinbase as a hidden fee, which Coinbase refers to as the "spread" (the "**Spread Fee**"). Coinbase collects a similar 1% Spread Fee in sell transactions by quoting consumers selling a cryptocurrency a price that is 1% *lower* than the market price. The hidden Spread Fee increases to 2% for transactions in which consumers convert one cryptocurrency to another.

5.    Consumers who become apprised of the Spread Fee after completing transactions on the Coinbase platforms have been complaining about this hidden fee for years. But Coinbase continues to violate the law, harming millions of consumers across the country. Coinbase's incentive for its continued unlawful behavior is clear—the Spread Fee is extremely lucrative, earning Coinbase hundreds of millions of dollars every year at the expense of unwitting consumers who do not know they are paying the Spread Fee at the time of their transactions on the Coinbase platform.

6.    Plaintiffs bring this class action lawsuit to recover from Coinbase the hidden Spread Fees that Coinbase has unlawfully concealed from them and other similarly situated consumers and to obtain an order enjoining Coinbase's unlawful conduct described herein. Plaintiffs assert claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and False Advertising Law, Cal. Bus. & Prof. Code § 17500, and New York General Business Law §§ 349, 350, which prohibit companies from engaging in any practice that is misleading or has a likelihood or tendency to deceive or confuse the public.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2) because: (a) Plaintiffs assert a class action involving more than 100 class members; (b) Plaintiffs Cordero and Goodwin are citizens of a state different from Defendant, and more than

two-thirds of the Class reside in states other than California; and (c) the aggregate amount in controversy, exclusive of interest and costs, is more than $5,000,000.00.

8.      This Court has personal jurisdiction over Coinbase. Until 2020, Coinbase maintained its headquarters in San Francisco, California. In 2020, Coinbase announced that it had become "a decentralized company, with no headquarters." Despite Coinbase's claim that it has no headquarters, Coinbase maintains its principal offices in California, and Coinbase's Chief Executive Officer, Chief Operating Officer, and Chief Legal Officer, among other Coinbase executives and many Coinbase employees, reside and/or work in California. Further, Coinbase purposely avails itself of this forum by conducting business in California, including by extensively marketing its cryptocurrency trading platform in California and providing cryptocurrency trading services in California. Plaintiffs' claims arise out of or relate to Coinbase's business activities in California.

9.      The Court also has jurisdiction over Coinbase because Coinbase consented to jurisdiction in the user agreement (the "**User Agreement**"), to which Coinbase makes every customer—including Plaintiffs—consent. *See* User Agreement, Appendix 5, § 1.3. The User Agreement is attached hereto as Exhibit A.

10.     Venue is proper in San Francisco because Coinbase's principal place of business is in San Francisco and because Coinbase engaged in unlawful business activities in San Francisco.

## DIVISIONAL ASSIGNMENT

11.     Pursuant to Northern District of California Local Rules 3-2(d) and 3-5(b), this action is filed in the San Francisco Division of the Northern District of California where Coinbase maintains its principal place of business and where Coinbase engaged in unlawful business activities.

## PARTIES

12.     Plaintiff Ryan Cordero is, and at all relevant times was, a citizen of New York who resides in New City, New York, and who unknowingly paid a hidden Spread Fee to Coinbase when executing trades on Coinbase's default trading platform.

13.     Plaintiff Patrick B. Goodwin is, and at all relevant times was, a citizen of New York who resides in New York, New York, and who unknowingly paid a hidden Spread Fee to Coinbase when executing trades on Coinbase's default trading platform.

COMPLAINT
CASE NO: 3:25-cv-4024

14.     Plaintiff Henry Hobson III is, and at all relevant times was, a citizen of California who resides in Adelanto, California, and who unknowingly paid a hidden Spread Fee to Coinbase when executing trades on Coinbase's default trading platform.

15.     Plaintiff Christopher Johnson is, and at all relevant times was, a citizen of California who resides in San Marcos, California, and who unknowingly paid a hidden Spread Fee to Coinbase when executing trades on Coinbase's default trading platform.

16.     Defendant Coinbase is a Delaware corporation incorporated in 2012. Coinbase is a wholly-owned subsidiary of Coinbase Global, Inc., a Delaware corporation which is publicly traded under the ticker "COIN." As noted in ¶ 8, until 2020, Coinbase maintained its headquarters in San Francisco, California. In 2020, Coinbase announced that it had become "a decentralized company, with no headquarters." Despite Coinbase's claim that it has no headquarters, Coinbase maintains its principal offices in California, and Coinbase's Chief Executive Officer, Chief Operating Officer, and Chief Legal Officer, among other Coinbase executives and many Coinbase employees, reside and/or work in California.

## FACTS

17.     Coinbase operates a trading service through which individual retail consumers, like Plaintiffs and others, can buy, sell, and convert cryptocurrencies, such as Bitcoin. Consumers can access Coinbase's trading service by using platforms operated by Coinbase on the company's website (Coinbase.com) or mobile application.

18.     Coinbase's website and mobile application show consumers a snapshot of current prices of various cryptocurrencies that are available to trade on Coinbase ("**Trade Page**"). The image below captures a Trade Page generated by Coinbase on May 23, 2024. To buy, sell, or convert a cryptocurrency, consumers need only click on the blue "Buy" button next to the specific cryptocurrency that they would like to transact, and Coinbase will provide them with an order screen.

COMPLAINT
CASE NO: 3:25-CV-4024



| Name | Price | Change | Market cap ▾ | | Watch |
|------|-------|--------|--------------|---|-------|
| **Bitcoin** BTC | $67,907.55 | -2.12% | $1.3T | Buy | ☆ |
| **Ethereum** ETH | $3,810.33 | +1.26% | $458.4B | Buy | ☆ |
| **Tether** USDT | $1.00 | +0.02% | $111.9B | | ☆ |

19.     The Trade Page does not define the term "Price." However, Coinbase's Help Center states that its Trade Page provides the "current market price" of a given cryptocurrency.

**A.     COINBASE'S BAIT AND SWITCH AND HIDDEN SPREAD FEE**

20.     **Buy Trades**. The image below was generated moments after the Trade Page at ¶ 18 and captures the screen that Coinbase generates when consumers commence potential cryptocurrency "buy" trades (the "**Initial Buy Screen**"). In this example (taken on May 23, 2024), the consumer who clicks "buy" on the Trade Page seeks to purchase $100 of Bitcoin at the "Price" of $67,907.55 per Bitcoin.

21.     As shown in the image above, Coinbase's Initial Buy Screen shows consumers three key pieces of information: (1) the transaction amount specified by the consumer (here, $100), (2) the

amount of cryptocurrency that the consumer will receive in connection with the transaction (here, 0.0014024 BTC), and (3) the source and limit of funds available to pay for the transaction (here, Chase and a $100,000 limit), if purchased by that consumer.

22.     A consumer who would like to place a trade like the one summarized on the Initial Buy Screen at ¶ 20 above must next click the blue "Review order" button at the bottom of the Initial Buy Screen. Doing so prompts Coinbase to show the consumer its Order Preview. The image below captures the Order Preview generated by Coinbase for the potential purchase of $100 of Bitcoin on May 23, 2024, moments after the Initial Buy Screen at ¶ 20 was generated:



23.     As shown in the image above, Coinbase's "buy" Order Preview purports to provide consumers with a summary of the terms of their potential purchases. The above example from May 2024 shows (1) the type and quantity of cryptocurrency to be traded (here, 0.0014024 Bitcoin); (2) the "Price" of the specified cryptocurrency (here, $68,639.48 per Bitcoin); (3) the amount the consumer will spend on the cryptocurrency purchase (here, $96.26); and (4) the amount the consumer will spend on the "Coinbase fee" (here, $3.74).

24.     However, the "Price" Coinbase showed consumers on the Trade Page is *not* the "Price" Coinbase showed consumers on the "buy" Order Preview. The "Price" Coinbase charges consumers who are purchasing cryptocurrency always goes up.

25. That is because, between the Trade Page and the Order Preview, Coinbase changes the definition of the word "Price" so that it includes the hidden Spread Fee that the consumer pays Coinbase in connection with the transaction. For simple buy (and sell) orders, the Spread Fee is typically one percent.

26. The Trade Page and Order Preview above demonstrate how the Spread Fee works in "buy" trades. The "Price" Coinbase shows consumers on the Trade Page (*see* ¶ 18) is $67,907.55 per Bitcoin, but the "Price" Coinbase shows consumers on the Order Preview that follows (*see* ¶ 22) is $68,639.48 per Bitcoin. That $731.93 increase in the "Price" of Bitcoin from the Trade Page to the Order Preview primarily reflects the one-percent Spread Fee that Coinbase secretly charges consumers.[2]

27. Instead of plainly showing the Spread Fee that it charges to complete the purchase on the Order Preview, Coinbase hides information about the Spread Fee in the website equivalent of fine print: the "tooltip" (i.e., the question mark) next to the term "Price" on the Order Preview. If—and only if—a consumer clicks on the tooltip, Coinbase redirects the consumer to a page that states: "The price of cryptocurrency changes frequently based on market conditions. The price quoted includes a 1.00% spread. Learn more about spread here." The message does not specify what number Coinbase's Spread Fee is one percent of, or whether the "price quoted includes" anything other than the Spread Fee. Unlike the Coinbase Fee, the message does not tell the consumer what the one percent Spread Fee for the transaction on the Order Preview actually costs. The message also does not inform the consumer that the "Price" advertised on the Trade Page did not include a spread.

28. Consumers have no reason to click on the tooltip next to the term "Price" on the Order Preview, given that the "Price" Coinbase shows on the Trade Page with the "Buy" button (*see* ¶ 18) and elsewhere on its website is used to denote the current market price of the cryptocurrency. Consumers cannot be expected to confirm that Coinbase has not changed the definition of the term "Price" from one page to the next without warning.

---

[2] The difference in this example is not exactly 1% because the underlying market price of the cryptocurrency changed slightly between the time the Trade Page and Order Preview were generated. The vast majority of the change, however, is attributable to the 1% Spread Fee.

COMPLAINT
CASE NO: 3:25-CV-4024

29.     This tooltip is insufficient to cure Coinbase's deception, just as fine print that a user must actively seek out is not sufficient to dispel the deception.

30.     Coinbase's bait-and-switch on the "Price" term is not the only misleading information on its Order Preview. Because Coinbase's Order Preview also prominently features the "Coinbase fee" that Coinbase charges for the purchase, consumers have no reason to suspect that Coinbase is also charging an additional fee—the Spread Fee—for the trade.

31.     Even when consumers view their transaction records after a transaction has been completed, Coinbase conceals the Spread Fee. The consumer is able to view the information available in the Order Preview—the "Price," Coinbase fee, and Subtotal—but again, the Spread Fee is not noted for the consumer.

32.     Coinbase's decision to hide the Spread Fee in the "Price" on its Order Preview, rather than clearly disclosing the fee as its own line item in the Order Preview, or including the fee in the Coinbase Fee, serves no purpose other than to deceive consumers. Coinbase could easily show consumers exactly how much they will be paying Coinbase in fees. Coinbase intentionally obfuscates the true amount of the fees it charges because it does not want consumers to realize just how much they are paying Coinbase for each trade.

33.     **Sell Trades**. Coinbase uses the same bait-and-switch on the "Price" and the same misleading "Coinbase fee" disclosure for cryptocurrency "sell" trades. The image below (the "**Initial Sell Screen**") captures the screen generated by Coinbase for the potential sale of $100 of Bitcoin at the "Price" of $67,907.55 as shown on the May 23, 2024 Trade Page at ¶ 18. The Initial Sell Screen below appears when a consumer toggles to the "Sell" tab at the top of the Initial Buy Screen at ¶ 20:



34.    In addition to the transaction amount specified by the consumer, Coinbase's Initial Sell Screen also shows the consumer the amount of cryptocurrency the consumer will sell in the transaction and the amount of cryptocurrency in that consumer's account available to sell. Coinbase calculates the amount of cryptocurrency that the consumer has available to sell (here, $124.80) using the current market price of the cryptocurrency (*i.e.*, without taking into account the Spread Fee).

35.    While the Trade Page generated for consumers who initiate transactions to sell a cryptocurrency on Coinbase provides the current market price of the specified cryptocurrency (*e.g.*, $67,907.55 on May 23, 2024), the "Price" changes when a consumer decides to place a trade based on the Initial Sell Screen by clicking the blue "Review order" button at the bottom of the page. The image below captures a "sell" Order Preview generated moments after the Trade Page and the Initial Sell Screen in ¶¶ 18 and 33 above:

COMPLAINT
CASE NO: 3:25-CV-4024



36.     As shown in the image above, Coinbase's "sell" Order Preview page provides consumers with a summary of the terms of their potential sale. This example from May 2024 provides (1) the type and quantity of cryptocurrency to be traded (here, 0.00148877 Bitcoin ("**BTC**")); (2) the "price" of the specified cryptocurrency (here, $67,169.54 per Bitcoin); (3) the dollar value of the sale (here, $100); (4) the amount the consumer will spend on the "Coinbase fee" (*e.g.*, $3.74); and (5) the total payout that the consumer will receive in connection with the sale (here, $96.26).

37.     Once again, the "Price" Coinbase shows consumers on the Trade Page is *not* the "Price" Coinbase shows consumers on the "sell" Order Preview. The "Price" Coinbase pays consumers who are selling cryptocurrency always goes down.

38.     A reasonable consumer reading this "sell" Order Preview would expect that she is selling $100 worth of Bitcoin and receiving $96.26 in return after paying Coinbase $3.74 in fees. Not so. That is because the "sale" amount is based on the "Price" Coinbase quotes on its Order Preview, not the current market price of the cryptocurrency listed as the "Price" on Coinbase's Trade Page. And the "Price" Coinbase quotes is one percent *lower* than the market price of the cryptocurrency listed as the "Price" on Coinbase's Trade Page because it includes Coinbase's hidden Spread Fee. Thus, in the Order Preview in ¶ 35 above, the consumer is actually selling $101 worth of Bitcoin

based on its market price—not $100 worth of Bitcoin. That one-dollar difference is the hidden Spread Fee that Coinbase collects.

39.    As with the buy Order Preview, Coinbase's sell Order Preview hides its purported, but wholly inscrutable and inadequate, disclosure of the Spread Fee in the same tooltip next to the term "Price" as discussed in ¶ 27, above. That tooltip also is insufficient to cure the deceptive "Price" information in Coinbase's sell Order Preview because consumers have no reason to click on the tooltip, given that the "Price" Coinbase shows on the Trade Page, and elsewhere on its website, is used to denote the current market price of the cryptocurrency. Moreover, because Coinbase's Order Preview also prominently features the "Coinbase fee" that Coinbase charges for the purchase, consumers have no reason to suspect that Coinbase is also charging an additional fee—the Spread Fee—for the trade.

40.    **Conversion Trades**. Consumers who convert cryptocurrency on Coinbase's default trading platform face similar deception. The Order Preview that Coinbase provides to consumers who want to trade one cryptocurrency for another has always listed the "Exchange rate" and the "Coinbase fee" the consumer will pay in connection with the transaction. The image below captures a Coinbase Order Preview for the potential conversion of $100 worth of Bitcoin listed at the "Price" of $67,907.55 to Ethereum ("**ETH**") listed at the "Price" of $3,810.33 on the May 23, 2024 Trade Page at ¶ 18, generated moments after the Trade Page and the "buy" and "sell" Order Previews in ¶¶ 22 and 35 above:



41.     The "exchange rate" Coinbase shows in its "convert" Order Preview above is not determined using the current market price listed on Coinbase's Trade Page. Instead, the exchange rates include a hidden 2% Spread Fee paid to Coinbase. As with buy or sell orders, the "Coinbase fee" that the "convert" Order Preview shows excludes the Spread Fee that Coinbase charges for the transaction. A reasonable consumer would expect to pay $1 for the conversion in this example, but Coinbase is really charging almost $3.

42.     The tooltip for the term "exchange rate" is similar to the tooltips for buy and sell orders. If—and only if—a consumer clicks the tooltip, she lands on a page which states: "The exchange rate of cryptocurrency changes frequently based on market conditions. The exchange rate quoted includes a 2.00% spread. Learn more about spread here." The message does not specify what number the Spread Fee is two percent of, whether the "price quoted includes" anything else, or how much the two percent Spread Fee for the transaction on the Order Preview actually costs. The message also does not inform the consumer that the "Prices" advertised on the Trade Page did not include a spread.

43.     As with the buy and sell Order Previews, the tooltip in the convert Order Preview is insufficient to dispel Coinbase's deception. Because Coinbase's Order Preview prominently features the "Coinbase fee" that Coinbase charges for the purchase, consumers have no reason to suspect that Coinbase is also charging an additional fee—the Spread Fee—for the trade.

## B.    <u>COINBASE MISLEADS ITS LEAST SOPHISTICATED CUSTOMERS INTO PAYING HIGHER FEES</u>

44.     Coinbase offers two trading options for its customers—the default trading platform and the "Advanced" trading platform.

45.     Coinbase describes its "Advanced" trading option as an "advanced trading platform, intended for a more experienced trader." To switch to Advanced trading on Coinbase's website, a consumer must toggle an "Advanced" button on the bottom left-hand corner of their screen, as follows:

COMPLAINT
CASE NO: 3:25-cv-4024

1

2



3

4    46.    Coinbase's mobile application provides a similar button that allows users to switch

5    from its default to Advanced offerings, which claims that Advanced is "[f]or professional traders":

6

7    

8

9

10    47.    Despite Coinbase's claim that Advanced is "for professional traders," anyone can

11    trade on Advanced. Consumers do not need to apply for the feature or provide any additional

12    information to Coinbase to use the feature: they need only click the button shown above.

13    48.    The image below captures what Coinbase shows consumers who try to buy

14    cryptocurrency on "Advanced"—$100 of Bitcoin on May 23, 2024, in this example—including the

15    estimated "slippage," "average price," and "fee."

16

17

18

19    

20

21

22

23

24

25

26

27

28

49.    Unlike the tooltips in the Order Preview, the tooltips indicated by the circled "i" icons on this Advanced page deliver a message when the cursor hovers over it. The tooltip defines "est. slippage" to mean the "difference between the price the order begins executing at and the average execution price, given the liquidity of the order book."

50.    In this example, Coinbase Advanced estimates that a $100 buy order would have 0.00% slippage—meaning that there is no difference between the current market price of Bitcoin and the average execution price to complete the order. Because Coinbase estimates that the customer will have no slippage, the estimated price that Coinbase Advanced provides for this consumer is the market price of Bitcoin at the time of the transaction.

51.    In stark contrast to the prices shown on Coinbase's Order Preview in the default trading platform, the price Coinbase shows on the Advanced trading option does not include a Spread Fee. As a result, the only fee the consumer will be charged in this sample transaction is $0.80, the number indicated on the screen.

52.    An example will illustrate how differently Coinbase treats consumers who use its default and Advanced trading platforms.

a.    A consumer who places a $100 buy order on Coinbase's default trading platform must pay a one-percent Spread Fee that Coinbase hides in the price charged and is in addition to the $3.74 "Coinbase fee" listed on the Order Preview shown at ¶ 22, above, for a total of approximately $4.70 paid in fees to Coinbase.

b.    A consumer who places a $100 buy order on Coinbase's Advanced trading platform is assessed an 80-cent fee, and Coinbase charges no Spread Fee. That fee falls to 55 cents if the consumer trades more than $1,000 over the course of one month.

53.    Coinbase thus charges the Spread Fee only to its less-sophisticated customers—the consumers who use Coinbase's default trading platform and are less likely to detect the Spread Fees to which more experienced traders would object.

54.    The example above also shows that Coinbase's attempt to justify the Spread Fees it charges as "increas[ing] the likelihood of a successful transaction and allow[ing] Coinbase to lock in

your quoted price temporarily while processing your order" is nothing more than a pretense. Coinbase does not need to charge a Spread Fee to ensure successful transactions.

### C.      **COINBASE HAS CHANGED ITS ORDER PREVIEW, BUT HAS NOT CURED ITS DECEPTIVENESS**

55.      Coinbase has changed various aspects of its Order Preview from time to time, but two things remain constant: Coinbase has always covertly switched the price between the Trade Page and the Order Preview, and Coinbase has always hidden its Spread Fee from consumers.

56.      For example, Coinbase changed the Order Preview it shows consumers on its website in 2024, around the same time a California resident filed a class action lawsuit against the company, seeking a public injunction under California's Unfair Competition and False Advertising Laws to prohibit Coinbase from charging consumers who transact on its default trading platform a hidden Spread Fee. *See* Complaint, *Khan v. Coinbase*, Case No. CGC-24-615202 (Super. Ct. San Francisco Cnty. June 3, 2024).

57.      But Coinbase's new Order Preview screen still charges a different price from the "Price" advertised on the Trade Page and still provides deceptive and misleading information to consumers about the Spread Fee that Coinbase charges for a given cryptocurrency transaction, in violation of California and New York law. As shown below, the new Order Preview references the term "spread," without saying how much the spread charged for a given transaction is. Instead, the new Order Preview continues to hide the Spread Fee in the price it quotes. For example, the images below (captured on April 15, 2025) show a Trade Page that lists the "Price" of Bitcoin as $84,250.30 and an Order Preview generated by Coinbase for the potential purchase of $100 of Bitcoin by clicking "Buy" on the Trade Page:

COMPLAINT
CASE No: 3:25-cv-4024

**Trade Page**



**Order Preview**

58.     As shown in the image above, Coinbase's new buy Order Preview still shows (1) the type and quantity of cryptocurrency to be traded (here, 0.00113189 Bitcoin); (2) the "Price" of the specified cryptocurrency (here, $85,043.60 per Bitcoin); and (3) the amount the consumer will spend on the Coinbase "fee" (here, $3.74).

59.     Unlike the old Order Preview in ¶ 22, *supra*, however, Coinbase's new Order Preview (1) mentions the word "spread" at the bottom of the screen and (2) includes an advertisement for Coinbase's subscription service entitled "Coinbase One" (here, "Save $3.74 on this trade").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

60.     The new Order Preview contains the same tooltip discussed in ¶ 27 and adds a hidden hyperlink that references the Spread Fee. The way the hidden hyperlink works is as follows: if—and only if—a consumer clicks near the word "Total" at the bottom of the page, Coinbase provides a "Pricing details" page that says that the "Price includes a 1.00% spread." Here again, the message does not inform the consumer that the "Price" advertised on the Trade Page does not include a spread. Nothing on the Order Preview alerts consumers to the hidden hyperlink. And a consumer who somehow finds the hidden hyperlink would have no reason to click on it because the Order Preview expressly states the "fee" that Coinbase charges in connection with the transaction (*e.g.*, $3.74). The image below captures a Pricing Details page generated by Coinbase immediately after the above Trade Page and Order Preview examples show in ¶ 57:



| | Pricing details | |
| --- | --- | --- |
| 0.00113189 BTC x $85,043.60 | | $96.26 |
| Price includes a **1.00%** spread, learn more | | |
| Coinbase fee | | $3.74 |
| This fee is based on a combination of factors such as market conditions, payment method, and size of the order, learn more | | |
| **Total** | | **$100.00** |

61.     Critically, the "Price" Coinbase shows consumers on its new Order Preview—like the "Price" on its old Order Preview—is *not* the "Price" Coinbase shows consumers for that cryptocurrency on its Trade Page. That is because, between the Trade Page and the new Order Preview, Coinbase continues to change the definition of the word "Price" so that it includes the hidden Spread Fee that the consumer pays Coinbase in connection with the transaction.

62.     Moreover, although Coinbase's new Order Preview now mentions the word "spread" on the Order Preview, the plain text of the Order Preview still tells consumers nothing about what the spread is, how Coinbase calculates the spread, how much the spread will cost the consumer, or that the spread is an additional fee that Coinbase collects from the consumer to execute the transaction.

17

Instead, Coinbase continues to hide information about the Spread Fee behind tooltips that the company knows few consumers will actually see.

63.     Nor is there any reason for a consumer to know what the term "spread" means here, since even Coinbase uses the term "spread" to mean different things across its platforms. For example, on the Advanced platform that Coinbase markets to "professional traders," Coinbase defines the term "spread" to mean: "The difference between the highest bid (best bid) and the lowest ask (best ask)." For highly traded cryptocurrencies like Bitcoin, typically that number is roughly 0%. In other words, adding the term "spread" to the new Order Preview would not put even professional traders on notice that Coinbase charges a 1% Spread Fee on each transaction—let alone the unsophisticated consumers that Coinbase targets with its default trading platform.

64.     The deceptiveness of Coinbase's scheme is further highlighted by its advertisement of its Coinbase One subscription service on the new Order Screen.

65.     Coinbase One is a subscription service that allows consumers to trade on Coinbase's default trading platform with "zero trading fees." If a consumer clicks on the Coinbase One advertisement on the Order Preview, Coinbase shows the consumer the following:



**Join Coinbase One for zero trading fees**

**7 days free** then $29.99/month

66.     Despite Coinbase's claim, consumers who purchase the company's Coinbase One service still pay some trading fees in connection with transactions on Coinbase's default trading platform because Coinbase charges a Spread Fee on *all* trades on the default trading platform, including trades ordered by Coinbase One subscribers.

67.     In fact, for any given transaction, a consumer who has purchased Coinbase One will pay more in trading fees—via the Spread Fee—than she would pay to make the same transaction on Coinbase's Advanced trading platform without paying for a subscription.

COMPLAINT
CASE NO: 3:25-cv-04024

D.    **COINBASE'S HIDDEN SPREAD FEE IS HIGHLY LUCRATIVE**

68.    The real reason Coinbase charges less sophisticated consumers who use its default trading platform a hidden Spread Fee is that those fees are very lucrative.

69.    Filings made by Coinbase's parent company show that Coinbase's Spread Fees are a key revenue generator. One recent filing explained: "We generate fees from consumers trading on our platform, including through volume-based transaction fees and a spread depending on the type of trade." The company's filings also include the Spread Fees in the reported "transaction revenue"—a term defined to refer to "transaction fees that are either a flat fee or a percentage of the value of each transaction."

70.    Coinbase does not disclose how much it makes from the hidden Spread Fee. But a recent annual report from Coinbase's parent company provides some insight.

71.    In 2023, Coinbase increased the size of the hidden Spread Fee. The increased Spread Fee helped boost the company's transaction revenue by hundreds of millions of dollars. Coinbase's parent reported an "increase of $418.8 million attributed to changes in customer mix towards trades which have higher fees and pricing changes as [Coinbase] increased the spread on certain types of consumer trades in 2023."

72.    Shortly after the increase, a securities analyst asked Coinbase's management about the increase to the Spread Fee during a May 2023 earnings call. Coinbase's Chief Financial Officer explained that the rationale behind the increase was to boost profits. She explained: "we are focused right now on growing revenue, growing engagement. So, pricing fee plus spread is an important component on this[.]"

73.    Coinbase's plan to boost revenue using the hidden Spread Fee worked. In a November 2023 earnings call, Coinbase's CFO stated that the company saw "high fees on the platform" as a result of Coinbase's decision to "increase spread on simple trading."

74.    In August 2023, the CFO explained: "[W]e did raise [the] spread . . . and we haven't seen any meaningful change in our consumer behavior from that event. We monitored that very closely. We experiment our fees on a regular basis, and we think that's part of just building a healthy business to understand pricing with our customers."

75.     There is a reason Coinbase did not see "any meaningful change in [its] consumer behavior" when it increased the Spread Fee in 2023: unsuspecting consumers did not realize that fees for trades increased because Coinbase's Spread Fee is deceptively hidden from consumers using the default trading platform.

**E.     CONSUMERS ARE DECEIVED BY COINBASE'S HIDDEN SPREAD FEE**

76.     Online forums are replete with stories shared by consumers who were deceived by Coinbase's hidden Spread Fees. Below is a small sampling of those posts.

77.     In a post entitled "Beware Coinbase's outrageous hidden fees,"[3] one upset consumer described Coinbase's unacceptable "lack of transparency around fees" as follows:



**r/CoinBase** · 5 mo. ago
Such_Peak_2591

## Beware Coinbase's outrageous hidden fees

I recently had a terrible experience with excessive fees charged by Coinbase that I wanted to share as a warning to others.

I converted around $40,000 USDC to bitcoin on Coinbase. However, the resulting bitcoin was only worth around $39,200 – meaning Coinbase charged me about $800 in fees (about 3% fee rate for one single transaction)!

The fee amount was exorbitant and not disclosed to me ahead of time. I thoroughly reviewed Coinbase's trading records and could not find any details on the specific fees for my transaction. As a customer, I have a right to know exactly what fees I'm being charged. The lack of transparency around fees is completely unacceptable.

Has anyone else experienced crazy high hidden fees on Coinbase? Is there any way I could dispute this and get it back? I suggest being very cautious when using their platform.

78.     In response to that post, another consumer shared a similar experience, describing the undisclosed spread as "just a sneaky way to charge more fees":

I had exactly the same experience converting BTC to USDC. I was charged 2% for the spread which is just a sneaky way to charge more fees. I contacted them through the online chat which is the only live helpdesk which they have. (You have to type help to get a real online agent.). They told me that the costs I paid were not fees but due to the spread as being the difference between the price I paid for USDC against the market price. USDC is a stable coin and does not fluctuate in price so it was just pure nonsense wha they said. It's just a clever trick to charge exorbitant fees. I was really disgusted and I removed all my assets from my COinbase account.

---

[3] Reddit (Oct. 2023), https://www.reddit.com/r/CoinBase/comments/17nmv3u/beware_coinbases_outrageous_hidden_fees/.

79.     In a different post entitled "Coinbase skimming more than just their fees?",[4] another consumer reported this:



**Coinbase skimming more than just their fees?**

I made a $521 purchase via Apple Pay for $500 in Bitcoin.

When it gets to my wallet, I have $487 in Bitcoin.

Why is $13 missing? Bitcoin did not go down 2.5% in the 30 seconds it took to complete the purchase. Are there additional fees that Coinbase is not showing in their buy preview?

80.     That same post went on to explain getting "scammed for $13" by trusting Coinbase's "Buy Preview," which did not disclose the Spread Fee as a transaction fee:

Thing is this wasn't part of the a transaction fee, it wasn't part of the "Buy Preview" which said transaction fee was ~$21.

Buyer preview said I was getting $500 of BTC for $521 so I trusted that, and end up with $487. So it feels like I got scammed for $13.

81.     A similar post entitled "How Coinbase Stole $40,000 from my savings"[5] explains how one consumer discovered the "hidden 'spread' price" only after paying undisclosed Spread Fees charged on transactions where Coinbase's app indicated "$0.00" in fees:

**How Coinbase Stole $40,000 of my savings.**

I'd like to tell you a short story about how Coinbase stole over $40,000 from me. I'll link to a site I built so people can read more.

When you convert from one crypto to another, Coinbase's app says "Fee: $0.00". Simple as that. As clear as that. Can't go wrong. Nothing to negotiate. Zero dollars and zero cents. See screenshot.

One day, as the market was down, I played around and converted some of the money between different currencies. Maybe three or four times, after which I stopped. I figured that if the fee is zero, there's nothing to worry about.

Little did I know that behind the scenes Coinbase charges a hidden "spread" price -- and I understand they need to make money, and a spread is fine -- of about 6% of your total assets. That means that if you convert Bitcoin -> Eth -> Litecoin -> Bitcoin, you'll lose a quarter of what you own.

---

[4] Reddit (Aug. 2023) https://www.reddit.com/r/CoinBase/comments/16jbyqb/coinbase_skimming_more_than_just_their_fees/.
[5] Reddit (May 2021), https://www.reddit.com/r/CoinBase/comments/pt8ogx/how_coinbase_stole_40000_of_my_savings/.

COMPLAINT
CASE NO: 3:25-CV-4024

82.    Yet another consumer complained that "the problem is the falsehood in informing the customer that this transaction has $0 cost when it really is not":[6]

> When I was going to make an exchange of $1000 USDC to BTC the app clearly showed me a commission of $0 but after making the exchange I received only $979.97, I was reviewing my old exchanges where they also showed me a commission of $0 and I find that they have charged me commission on each transaction, the problem is not the cost, the problem is the falsehood in informing the customer that this transaction has $0 cost when it really is not, I will withdraw my funds from Coinbase and will never return to this company

83.    A response to that post quipped: "he was charged the 'Dummy-tax' (Spread)."

84.    Consumers have continued to complain about Coinbase's hidden Spread Fee even after the company changed its Order Preview last year. For example, one consumer complained in a January 2025 post that "hiding [the Spread Fee] in the price makes it impossible to know what you're actually paying":[7]

> What's really wrong here is that these fees aren't clearly communicated, and they punish users who trust these platforms to be fair. It's one thing to charge fees upfront, but hiding them in the price makes it impossible to know what you're actually paying. It feels predatory, especially for those making high-value trades who stand to lose thousands without even realizing it. It feels like a scam.

85.    A similar post from December 2024 entitled "Coinbase is ripping you off" described how a consumer discovered Coinbase's Spread Fee and hidden disclosure only after he compared his purchase prices to pricing data from other exchanges:[8]

> So I was looking at some assets, cross-referencing through some other exchanges that show a few more decimal places than coinbase. Well I started noticing some discrepancies, when I sold an asset high and it started going down. I looked to see how many more I would be able to purchase with that same amount of money, since the price was lower. Lo and behold, although the price was lower, somehow I would be getting hundreds less of that asset in that purchase. So I started looking at the price quoted for that sale. "Price is live", it said. But then I saw the tiny little grey "?" button next to that statement. Pushing it, I was then informed that for "buy" transactions, coinbase adds a 1% "spread" without telling you that upfront. It had a hyperlink "learn more about this spread" there, but pushing it just takes you to coinbase support page, which is literally designed to be unhelpful and difficult to navigate. No further mention of this "spread" was on that page. 1% might not seem like a lot, but when they have the nerve to say you're saving 100% on fees with coinbase plus, or whatever it's called, that's messed up on its own. Plus, one percent of *every buy* starts to add up when you're doing the daytrader thing. Can't help but notice that "spread" doesn't apply to sell orders. So, yeah, yet another reason to say CUCK FOINBASE

---

[6] Reddit (Feb. 2024), https://www.reddit.com/r/CoinBase/comments/1b46hmc/f_coinbase_hidden _fee/ (this post has since been deleted).
[7] Reddit (Jan. 2025), https://www.reddit.com/r/CoinBase/comments/1i7tbk9/spread_fees_on_ crypto_exchanges_are_ridiculous/.
[8] Reddit (Dec. 2024), https://www.reddit.com/r/CoinBase/comments/1h4mhi1/coinbase_is_ ripping_you_off.

COMPLAINT
CASE NO: 3:25-cv-4024

86.     These consumers are not alone in their confusion and frustration. Even industry insiders have complained about Coinbase's hidden Spread Fee. Cryptoslate—a popular cryptocurrency news website—wrote an article about Coinbase in which it complained about Coinbase's failure to include the spread in its Coinbase fee. It said: "What is even more outlandish to those experienced with exchanges is that [the Coinbase fee] does not include the spread."[9]

## F.     PLAINTIFFS' EXPERIENCE USING COINBASE

87.     Plaintiffs here were each deceived or confused by Coinbase's hidden Spread Fee.

88.     Plaintiff Cordero has utilized Coinbase's default trading platform to execute numerous cryptocurrency transactions, including transactions to purchase, sell, and convert various cryptocurrency assets, since at least 2021. Plaintiff Cordero was unaware, at the time of these transactions, that he was being charged a hidden Spread Fee by Coinbase.

89.     Plaintiff Goodwin has utilized Coinbase's default trading platform to execute numerous cryptocurrency transactions, including transactions to purchase, sell, and convert various cryptocurrency assets, since at least 2023. Plaintiff Goodwin was unaware, at the time of these transactions, that he was being charged a hidden Spread Fee by Coinbase.

90.     Plaintiff Hobson has utilized Coinbase's default trading platform to execute numerous cryptocurrency transactions, including transactions to purchase, sell, and convert various cryptocurrency assets, since at least 2019. Plaintiff Hobson was unaware, at the time of these transactions, that he was being charged a hidden Spread Fee by Coinbase.

91.     Plaintiff Johnson has utilized Coinbase's default trading platform to execute numerous cryptocurrency transactions, including transactions to purchase, sell, and convert various cryptocurrency assets, since at least 2024. Plaintiff Johnson was unaware, at the time of these transactions, that he was being charged a hidden Spread Fee by Coinbase.

---

[9] Liam "Akiba" Wright, *Is the Coinbase One Subscription for $0 transaction fees worth the money?*, CryptoSlate (Mar. 24, 2022, 11:43 pm), https://cryptoslate.com/is-a-coinbase-one-subscription-worth-the-investment/.

COMPLAINT
CASE NO: 3:25-cv-4024

**G.**      <u>**THE USER AGREEMENT**</u>

92.      Coinbase requires each of its customers to consent to its lengthy User Agreement before they can make any transactions.

93.      <u>**Choice of Law.**</u> The User Agreement contains a California choice-of-law provision. Section 9.5 of the User Agreement states that each customer "agree[s] that the laws of the State of California, without regard to principles of conflict of laws, will govern this Agreement and any Dispute, except to the extent governed by federal law." Exhibit A.

94.      The User Agreement also contains an Arbitration Agreement.

95.      <u>**Mass Arbitration Requirement**</u>. The Arbitration Agreement contains a "Batch Arbitration" provision that requires mass arbitration of claims that are "substantially similar." That provision says:

> To increase the efficiency of administration and resolution of arbitrations, you and Coinbase agree that in the event that there are one hundred (100) or more individual Requests of a substantially similar nature filed against Coinbase by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period (or as soon as possible thereafter), the AAA shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award.

Exhibit A.

96.      The Arbitration Agreement does not permit consumers to opt out of mass arbitration if their claim falls under the Batch Arbitration provision. Instead, the Arbitration Agreement states that if a consumer wants to opt out of mass arbitration and arbitrate her claims on a bilateral, individualized basis, AAA will appoint an arbitrator to determine whether the Batch Arbitration provision applies to the consumer's claim. The Arbitration Agreement says: "To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise the AAA, and the AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process." Exhibit A.

97.     The AAA rules currently in effect are attached to this Complaint as Exhibits B - D and include the AAA rules applicable to Batch Arbitration. Those AAA rules are subject to change. Under the current AAA Rules, a consumer who wants to proceed individually would need to pay a $225 fee, and consumers proceeding by mass arbitration would generally need to pay at least $125 in fees for the right to participate in the mass arbitration.[10]

98.     **Class Waiver**. Although the Arbitration Agreement requires mass arbitration, it waives consumers' right to assert a class or mass action. The Arbitration Agreement contains a "Waiver of Class and Other Non-Individualized Relief," which says:

> You and Coinbase agree that, except as specified in subsection 1.8, each of us may bring claims against the other only on an individual basis and not on a class, representative, or collective basis, and the parties hereby waive all rights to have any dispute be brought, heard, administered, resolved, or arbitrated on a class, collective, representative, or mass action basis. Only individual relief is available, and disputes of more than one customer or user cannot be arbitrated or consolidated with those of any other customer or user. Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim.

Exhibit A.

99.     The Waiver of Class and Other Non-Individualized Relief effectively precludes the majority of the Class here, including Plaintiffs, from asserting their claims against Coinbase because the cost associated with filing an arbitration—let alone actually arbitrating their claims—is greater than the value of the relief available to them (*i.e.*, the sum of the Spread Fees they paid Coinbase over the past four years).

100.     Filings made by Coinbase's parent company show that the purpose of the Waiver of Class and Other Non-Individualized Relief is to limit Coinbase's liability. For example, one filing states that "prohibitions or limitations on or discontinuation of the use of such arbitration or class action waiver provisions could subject [Coinbase] to additional lawsuits, including additional consumer class action litigation, and significantly limit [Coinbase's] ability to avoid exposure from consumer class action litigation."

---

[10] This does not take into account the circumstances in which certain individuals might be able to apply for an exemption to the fee requirements.

101.    The Waiver of Class and Other Non-Individualized Relief is invalid and unenforceable under governing California law.

102.    The Arbitration Agreement further states that disputes relating to the "Waiver of Class and Other Non-Individualized Relief" must be heard by a court—not an arbitrator.

103.    **Severability**. The Arbitration Agreement contains a severability clause, which says that, "if a court decides by means of a final decision" that the Waiver of Class and Other Non-Individualized Relief is "invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief)," that "particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated in the state or federal courts located in the State of California."

104.    **Other Unfair and Oppressive Terms of the Arbitration Agreement**. The Arbitration Agreement also contains several other provisions that are highly unfair and oppressive toward consumers. For example, consumers have no right under the Arbitration Agreement to a hearing if their request for relief is worth less than $25,000. That is true even where the consumer is required to mass arbitrate, and other consumers in their "batch" have the right to a hearing. Thus, a consumer might find herself bound by the conclusion reached at a hearing in which she had no right participate.

105.    The User Agreement also gives Coinbase the ability to unilaterally change any portion of the User Agreement—including the Arbitration Agreement—and states that a consumer's use of Coinbase's platform constitutes acceptance of the amended terms. That provision is particularly egregious because Coinbase holds assets for consumers and the only way a consumer can access those assets is by using Coinbase's platform. In other words, Coinbase holds a consumer's assets hostage unless and until the consumer agrees to Coinbase's amendments to the User Agreement.

106.    The User Agreement also purports to limit the ability of consumers to obtain relief based on damages resulting from Coinbase's gross negligence, fraud, willful misconduct or intentional violation of the law. The User Agreement § 8.2 states that:

> IN NO EVENT SHALL COINBASE, ITS AFFILIATES AND SERVICE
> PROVIDERS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS,
> AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE

LIABLE (I) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE SUPPORTED DIGITAL ASSETS ASSOCIATED WITH YOUR DIGITAL ASSET WALLET AT THE TIME OF THE EVENT OR CIRCUMSTANCE GIVING RISE TO YOUR CLAIM OR (II) FOR ANY LOST PROFITS, LOSS OF GOODWILL OR REPUTATION, LOSS OF DATA, DIMINUTION IN VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH ANY USE OF THE COINBASE SITE OR THE COINBASE SERVICES, OR THIS AGREEMENT, EVEN IF COINBASE HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE, EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF COINBASE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW.

Exhibit A.

This language provides for a limitation on Coinbase's liability, but carves out an exception for where there is a judicial determination that damages resulted from "Coinbase's gross negligence, fraud, willful misconduct or intentional violation of the law." The Arbitration Clause, however, purports to make that carve out illusory by requiring consumers to arbitrate their claims, so that they can never obtain the required "judicial determination."

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of the following Class (the "**Class**"):

> All United States residents and entities who have paid Coinbase Spread Fees in connection with the purchase, sale or conversion of any cryptocurrency utilizing Coinbase's default trading platform within the past four years.

108.    In the alternative, Plaintiffs bring this class action on behalf of the following sub-classes (together, the "**Sub-Classes**"):

> **New York Sub-Class:** All State of New York residents and entities who have paid Coinbase Spread Fees in connection with the purchase, sale or conversion of any cryptocurrency utilizing Coinbase's default trading platform within the past four years.

> **California Sub-Class:** All State of California residents and entities who have paid Coinbase Spread Fees in connection with the purchase, sale or conversion of any cryptocurrency utilizing Coinbase's default trading platform within the past four years.

109.    Excluded from the Class are Defendant and its parents, subsidiaries and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class based upon subsequently discovered information and reserve the right to establish sub-classes where appropriate.

110.    The class is so numerous that joinder of all members is impractical. Plaintiffs believe that there are at least hundreds, if not thousands, of proposed members of the Class throughout the United States. The exact number and identity of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.

111.    Common questions of law and fact exist as to all the Class members and predominate over any issues solely affecting individual Class members. The common and predominating questions of law and fact include, but are not limited to:

 a. Whether Defendant engaged in deceptive and/or unfair business practices by failing to adequately disclose and/or by concealing the Spread Fee;

 b. Whether Defendant engaged in deceptive and/or unfair business practices by failing to adequately disclose and/ or concealing the actual price it would charge consumers for transacting a cryptocurrency trade on its platform;

 c. Whether Defendant engaged in false advertising by not fully disclosing and/or concealing the Spread Fee;

 d. Whether Defendant engaged in false advertising by failing to adequately disclosed and/ or concealing the actual price it would charge consumers for transacting a cryptocurrency trade on its platform;

 e. Whether a reasonable consumer would have been deceived by Defendant's conduct;

 f. Whether Defendant violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

 g. Whether Defendant violated the California's false advertising law, Cal. Bus. & Prof. Code § 17500;

 h. Whether Defendant violated N.Y. Gen. Bus. Law § 349;

 i. Whether Defendant violated N.Y. Gen. Bus. Law § 350;

 j. Whether restitution, disgorgement and/or other equitable relief is warranted; and

k.  Whether and to what extent Plaintiffs and the Class are entitled to recover attorneys' fees and costs.

112.  Plaintiffs' claims are typical of the claims of the class because they, like the Class, paid Coinbase a hidden Spread Fee.

113.  Plaintiffs will fairly and adequately protect the interests of the class because they have paid Coinbase a hidden Spread Fee during the class period, their interests do not conflict with the interests of the class, and they have obtained experienced litigation counsel, and they will adequately prosecute this action.

114.  Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

115.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

116.  Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

117.  The Classes may also be certified under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

118.  The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION AGAINST COINBASE**

**VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ*.**

**(Acts of Unfair Competition)**

119.    Plaintiffs reallege and incorporate by reference each of the paragraphs above as though fully set forth herein.

120.    Plaintiffs bring this count individually and on behalf of all Class members, and, alternatively, on behalf of California Sub-Class members.

121.    California's Unfair Competition Law ("**UCL**") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

122.    California's Legislature has determined that "advertising a price that is less than the actual price that a consumer will have to pay for a good or service" violates the UCL. Senate Bill 478.

123.    As alleged herein, Defendant has violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices.

124.    Within four years preceding the filing of this lawsuit and at all relevant times, in violation of the UCL, Coinbase has engaged, and continues to engage in, unlawful, unfair, or fraudulent business practices in connection with the hidden Spread Fees Coinbase charges consumers who trade cryptocurrency on its default trading platform.

125.    Coinbase has advertised, and continues to advertise, on its Trade Page a price that is less than the actual price that a consumer will have to pay for a cryptocurrency (or will receive from the sale or exchange of a cryptocurrency).

126.    In addition, Coinbase's business practices deceptively lead reasonable consumers to believe that the cryptocurrency "price" that Coinbase quotes in its Order Preview (for its default trading platform) is the market price of the given cryptocurrency, and that the "Coinbase fee" Coinbase quoted in its Order Preview (for its default trading platform) includes all fees that a consumer would pay Coinbase in connection with the transaction.

COMPLAINT
CASE NO: 3:25-cv-4024

127.    In fact, the "price" Coinbase has quoted to and charged—and continues to quote to and charge—consumers for cryptocurrency trades on its default trading platform includes a hidden Spread Fee. And the "Coinbase fee" understates Coinbase's true fees by excluding the Spread Fee.

128.    Coinbase's business practices are misleading and/or have a capacity, likelihood, or tendency to deceive or confuse the public.

129.    Plaintiffs and the Class relied, to their detriment, on Coinbase's misleading and deceptive practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not misled by Coinbase, they would have acted differently.

130.    Plaintiffs and the Class suffered an injury in fact and lost money as a result of Coinbase's unlawful, unfair, or fraudulent business practices.

131.    Coinbase's acts and omissions are likely to deceive the general public.

132.    Coinbase engaged in these unfair, deceptive, and unlawful practices to increase its profits. Accordingly, Coinbase has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq*. of the California Business and Professions Code.

133.    Plaintiffs and the Class seek appropriate relief under the UCL, including (1) restitution and/or disgorgement of the Spread Fees that Coinbase has unlawfully charged them over the past four years, and (2) such orders or judgments that may be necessary to enjoin Defendant from continuing its unfair practices. Equitable relief is available to Plaintiffs and the Class because they lack an adequate remedy at law.

## SECOND CAUSE OF ACTION AGAINST COINBASE

## VIOLATIONS OF CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*

### (False or Misleading Representations)

134.    Plaintiffs reallege and incorporate by reference each of the paragraphs above as though fully set forth herein.

135.    Plaintiffs bring this count individually and on behalf of all Class members, and, alternatively, on behalf of California Sub-Class members.

136.    California's false advertising law prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500.

137.    California's Legislature has determined that "advertising a price that is less than the actual price that a consumer will have to pay for a good or service" violates the false advertising law. Senate Bill 478.

138.    Within three years preceding the filing of this lawsuit, and at all relevant times, in violation of the FAL, Coinbase has made, and continues to make, untrue, false, deceptive, and/or misleading statements in connection with the hidden Spread Fees Coinbase charges consumers who trade cryptocurrency on its default trading platform.

139.    Coinbase has advertised, and continues to advertise, on its Trade Page a price that is less than the actual price that a consumer will have to pay for a cryptocurrency (or will receive from the sale or exchange of a cryptocurrency).

140.    In addition, Coinbase made, and continues to make, representations and statements (by omission and commission) that lead reasonable consumers to believe that the cryptocurrency "price" Coinbase quotes in its Order Preview (for its default trading platform) is the market price of the given cryptocurrency, and that the "Coinbase fee" Coinbase quoted in its Order Preview (for its default trading platform) includes all fees that a consumer would pay Coinbase in connection with the transaction.

141.    In fact, the "price" Coinbase has quoted to and charged—and continues to quote to and charge—consumers for cryptocurrency trades on its default trading platform includes a hidden Spread Fee and the "Coinbase fee" understates Coinbase's true fees by excluding the Spread Fee.

142.    Plaintiffs and the Class suffered an injury in fact and lost money as a result of Coinbase's unlawful, unfair, or fraudulent business practices.

143.    Coinbase's acts and omissions are misleading and/or have a capacity, likelihood, or tendency to deceive or confuse the public.

144.    Plaintiffs and the Class relied, to their detriment, on Coinbase's misleading and deceptive practices, including each of the misrepresentations and omissions set forth above. Had

Plaintiffs and those similarly situated been adequately informed and not misled by Coinbase, they would have acted differently.

145.    Coinbase's acts and omissions are likely to deceive the general public.

146.    Coinbase engaged in these misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Coinbase has engaged in false advertising, as defined and prohibited by section 17500, *et seq*. of the California Business and Professions Code.

147.    Plaintiffs and the Class seek appropriate relief under Cal. Bus. & Prof. Code § 17500, including (1) restitution and/or disgorgement of the Spread Fees that Coinbase has unlawfully charged them over the past four years, and (2) such orders or judgments that may be necessary to enjoin Defendant from continuing its unfair practices. Equitable relief is available to Plaintiffs and the Class because they lack an adequate remedy at law.

## THIRD CAUSE OF ACTION AGAINST COINBASE

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

148.    Plaintiff Cordero and Plaintiff Goodwin (collectively, the "**New York Plaintiffs**") reallege and incorporate by reference each of the paragraphs above as though fully set forth herein.

149.    The New York Plaintiffs bring this count individually and on behalf of all New York Sub-Class members.

150.    The New York Plaintiffs and members of the New York Sub-Class are "persons" as defined by the New York General Business Law ("**New York GBL**"). N.Y. Gen. Bus. Law § 349(h).

151.    Coinbase is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349(b).

152.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a).

153.    Defendant engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL. By deceptively leading reasonable consumers to believe that the cryptocurrency "price" that Coinbase quotes in its Order Preview (for its default trading platform) is the market price of the given cryptocurrency, and that the "Coinbase fee" Coinbase quoted in its Order Preview (for its default trading platform) includes all fees that a consumer would

pay Coinbase in connection with the transaction, Defendant engaged in deceptive business practices prohibited by the New York GBL.

154.    In fact, the "price" Coinbase has quoted to and charged—and continues to quote to and charge—consumers for cryptocurrency trades on its default trading platform includes a hidden Spread Fee. And the "Coinbase fee" understates Coinbase's true fees by excluding the Spread Fee.

155.    In the course of its business, Defendant violated the New York GBL by knowingly misrepresenting and/or intentionally concealing material facts regarding the Spread Fee. Specifically, in concealing the Spread Fee from consumers placing orders, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by the New York GBL:

**156.**    Causing likelihood of confusion or of misunderstanding as to the fees that consumers were paying in connection with their transactions;

**157.**    Advertising the cryptocurrencies with the intent not to sell them at the advertised price; and/or carrying out other actions that created a likelihood of confusion or of misunderstanding.

158.    Defendant's scheme and concealment of fees associated with their orders were material to the New York Plaintiffs and the New York Sub-Class members, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the New York Plaintiffs and the New York Sub-Class members would rely on the misrepresentations, concealments, and omissions. The facts concealed or not disclosed by Defendant to the New York Plaintiffs and the New York Sub-Class members are material because a reasonable person would have considered them to be important in deciding whether to enter into the transactions on Coinbase's default trading platform. Had they known the truth, the New York Plaintiffs and the New York Sub-Class members would not have transacted using Coinbase's default trading platform.

159.    The New York Plaintiffs and the New York Sub-Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

160.    Defendant had an ongoing duty to the New York Plaintiffs and the New York Sub-Class members to refrain from unfair and deceptive practices under the New York GBL in the course of its business. Specifically, Defendant owed the New York Plaintiffs and the New York Sub-Class

members a duty to disclose all fees, including the Spread Fee, that would apply to their transactions because it possessed exclusive knowledge, it intentionally concealed such material facts from the New York Plaintiffs and the New York Sub-Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

161.    In the course of its business, Defendant violated N.Y. Gen. Bus. Law § 349 by engaging in unfair and deceptive practices when it failed to disclose all material facts regarding the fees associated with the New York Plaintiffs' and New York Sub-Class Members' transactions on its default trading platform.

162.    The New York Plaintiffs and the New York Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

163.    Defendant's conduct constitutes a continuing risk to the New York Plaintiffs and New York Sub-Class members, as well as to the public. The unlawful acts and practices alleged herein affect the public interest.

164.    Pursuant to N.Y. Gen. Bus. Law § 349(h), the New York Plaintiffs and each New York Sub-Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. The New York Plaintiffs and Sub-Class members also seek attorneys' fees, an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under the New York GBL.

### FOURTH CAUSE OF ACTION AGAINST COINBASE

**VIOLATION OF NEW YORK'S GENERAL BUSINESS LAW, N.Y. GEN. BUS. LAW § 350**

165.    The New York Plaintiffs reallege and incorporate by reference each of the paragraphs above as though fully set forth herein.

166.    The New York Plaintiffs bring this count individually and on behalf of all New York Sub-Class members.

167.    New York's General Business Law § 350, the New York False Advertising Act ("**NY FAA**"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect[,]" taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a(1).

168.     Defendant made or disseminated in New York statements, which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including the New York Plaintiffs and the New York Sub-Class members.

169.     In the course of its business, Defendant violated the NY FAA by knowingly misrepresenting and/or intentionally concealing material facts regarding the fees associated with transactions made on its default trading platform. Specifically, in marketing, offering for sale, and selling cryptocurrency on its default trading platform, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by the NY FAA:

170.     Advertising the cryptocurrencies with the intent not to sell them at the price advertised; and/or carrying out other actions that created a likelihood of confusion or of misunderstanding.

171.     Defendant's scheme and concealment of the amount of fees that would be assessed on transactions made on its default trading platform were material to the New York Plaintiffs and the New York Sub-Class members, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the New York Plaintiffs and the New York Sub-Class members would rely on the misrepresentations, concealments, and omissions. The facts concealed or not disclosed by Defendant to the New York Plaintiffs and the New York Sub-Class members are material because a reasonable person would have considered them to be important in deciding whether to transact using Coinbase's default trading platform. Had they known the truth, the New York Plaintiffs and the New York Sub-Class members would not have transacted using Coinbase's default trading platform.

172.     The New York Plaintiffs and the New York Sub-Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

173.     Defendant had an ongoing duty to the New York Plaintiffs and the New York Sub-Class members to refrain from unfair and deceptive practices under the NY FAA in the course of its

business. Specifically, Defendant owed the New York Plaintiffs and the New York Sub-Class members a duty to disclose all the material facts concerning the fees associated with the transactions on its default trading platform because it possessed exclusive knowledge, it intentionally concealed such material facts from the New York Plaintiffs and the New York Sub-Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

174.    The New York Plaintiffs and the New York Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's deceptive advertising.

175.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or a generalized course of conduct that is continued and repeated in New York.

176.    Plaintiffs and the New York Sub-Class members are entitled to recover their actual damages or $500, whichever is greater. Because Defendant acted willfully or knowingly, Plaintiffs and the New York Sub-Class members are entitled to recover three times actual damages, up to $10,000. The New York Plaintiffs and Sub-Class members also seek attorneys' fees, an order enjoining Defendant's wrongful conduct, and any other just and proper relief available under the New York GBL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, those similarly situated, and the public, respectfully pray for judgment as follows:

1.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class, and Plaintiff's counsel as counsel for the Class;

2.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

3.    An order awarding restitution and/or disgorgement of the Spread Fees that Plaintiffs and Class have paid Coinbase over the past four years;

4.    Appropriate injunctive and equitable relief;

COMPLAINT
CASE NO: 3:25-cv-4024

5. Alternatively, an order awarding costs, restitution, disgorgement, punitive damages, statutory damages, treble damages, and exemplary damages, and, compensatory damages for economic loss, and out-of-pocket costs in an amount to be determined at trial to New York Sub-Class Members under to N.Y. Gen. Bus. Law §§ 349 and 350;

6. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

7. An award of costs, expenses, and attorneys' fees as permitted by law; and

8. Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED: May 8, 2025                                   Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
Jennifer L. Joost (Bar No 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L. Yeates (*pro hac vice* forthcoming
myeates@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

COMPLAINT
CASE NO: 3:25-CV-4024

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph (*pro hac vice* forthcoming)
gjoseph@jhany.com
Mara Leventhal (*pro hac vice* forthcoming)
mleventhal@jhany.com
Christopher J. Stanley (*pro hac vice* forthcoming)
cstanley@jhany.com
Benjamin A. Taylor (*pro hac vice* forthcoming)
btaylor@jhany.com
800 Third Avenue, 30th Floor
New York, NY 10022
Tel: (212) 407-1210
Fax: (212) 407-1280

*Counsel for Plaintiffs and the proposed Classes*